# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 5, 2013

## STATE OF TENNESSEE v. MICHAEL MARKS

**Appeal from the Criminal Court for Shelby County**
**No. 10-07558     James M. Lammey, Jr., Judge**

---

**No. W2012-00564-CCA-R3-CD - Filed May 3, 2013**

---

The defendant, Michael Marks, was convicted by a Shelby County Criminal Court jury of rape of a child, a Class A felony, and was sentenced by the trial court to twenty-five years at 100% as a child rapist. He raises the following issues on appeal: (1) whether the trial court erred by not requiring the State to make an election of offenses at the close of its case-in-chief; (2) whether the trial court erred by not requiring the State to make an election before the case was submitted to the jury; (3) whether the trial court erred by issuing a supplemental instruction on the election of offenses after the jury had already begun its deliberations; and (4) whether the evidence is sufficient to sustain the conviction. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Stephen C. Bush, District Public Defender; Barry W. Kuhn (on appeal) and Jennifer Case and Michael Johnson (at trial), Assistant Public Defenders, for the appellant, Michael Marks.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carrie Shelton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

According to the State's proof at trial, on the night of May 5, 2010, the eleven-year-

old victim, L.R.,[1] was visiting at the home of K.T., the mother of her ten-year-old cousin, when the defendant, who was K.T.'s boyfriend, took her to an empty bedroom, pulled down her pants and underwear, laid her on the floor, and performed oral sex on her and penetrated her vagina with his fingers. The victim immediately reported the abuse, and that same night the defendant confessed to the victim's mother and to K.T. that he had engaged in oral sex with the victim. He later gave a statement to police in which he again acknowledged oral sex but denied that he had penetrated the victim's vagina. On December 2, 2010, the Shelby County Grand Jury returned a two-count indictment charging the defendant with rape of a child and aggravated sexual battery. The State nolle prosequied the aggravated sexual battery count of the indictment, and the defendant proceeded to trial on the rape count on January 9, 2012.

K.T., the defendant's ex-girlfriend, testified that on the night of May 5, 2010, she returned home from work and began taking a bath, as was her habit. The telephone rang while she was in the tub, and her oldest daughter, K.R., brought it to her in the bathroom. When she answered, she learned that the caller was a 911 dispatcher calling because someone at the residence had hung up after dialing 911. K.T. said she told the dispatcher that her children must have been playing on the phone, apologized, and hung up. She then asked K.R. why they had been playing on the telephone. K.R., who was visibly shaking, told her that they had not been playing and related what the victim had told her. K.T. then called the victim into the bathroom, who told her what had happened with the defendant while K.T. was at work.

After the victim's revelation, K.T. immediately called the defendant into the bathroom and told him that the victim had accused him of touching her. She testified that the defendant initially denied it, arguing back and forth with the victim about whether the victim was lying. Eventually, however, the defendant stopped arguing and confessed to K.T. that he had done it. When she asked him what exactly he had done to the victim, he told her that he "ate her out," which K.T. interpreted as meaning that he had performed oral sex on her.

K.T. testified that the defendant was profuse in his apologies and told her that he would confess to the victim's mother, who arrived at the home approximately fifteen or twenty minutes after K.T. began questioning the defendant about the victim's allegations. She said the defendant left her home that night, but she later talked to him about the situation again. In that later conversation, the defendant explained that he had taken a pill on the night in question and had not been "in his right mind." On cross-examination, K.T. acknowledged that when the victim divulged the abuse to her that night in the bathroom, she never

_____

[1] In accordance with the policy of this court, we refer to the minor victim and her relatives by their initials only.

mentioned that the defendant had inserted his fingers into her vagina.

The victim's mother testified that when she arrived at K.T.'s home, the victim came up to her car hysterically crying that she was ready to go home. She asked what was wrong, but the victim kept repeating that she wanted to go home. The defendant then came up to the side of her vehicle, and she asked him what had happened. He replied that he was "just going to go on and tell [her] the truth" and then said, "I had oral sex with your daughter." She asked, "What?" and he repeated that he had oral sex with the victim.

Shocked, the victim's mother got out of the car and went into K.T.'s home, accompanied by the victim. When she got inside, K.T. told her that all she knew about the situation was what the children had just told her. The defendant, in the meantime, appeared subdued as he said, "It happened – I don't know why it happened – it just happened." At that point, the victim's mother left with the victim and began driving home. En route, she again asked the victim what had happened, and the victim tearfully related that the defendant had licked her private area and put his fingers inside her. When they reached home, the victim's father called the police, who came and took a report. The victim's mother testified that she took the victim to a children's hospital that same night and later set up an appointment through the Memphis Police Department's Sex Crimes Juvenile Abuse Squad for the victim to be interviewed by a counselor.

The victim, who was twelve years old at the time of trial, testified that on the night of May 5, 2010, she was doing homework and watching television in K.R.'s bedroom while K.T. was at work, leaving her, K.R., and K.R.'s two younger sisters in the home with the defendant. While on her way to the bathroom, she encountered the defendant in the living room, who told her to come with him to another bedroom. She testified that he took her to the bedroom, pulled her pants and underwear down, laid her on her back, and began touching her vagina with his hands and with his tongue. The victim said that the defendant touched both the inside and the outside of her vagina with his hands and his tongue. He then turned her over to her stomach and began "licking [her] behind." After he was finished, he told her not to tell anybody and left the room. The victim testified that she remained in the bedroom crying for about a minute after the defendant left and then went first to the bathroom and then back to K.R.'s bedroom, where she told her what had happened. She said that K.R. called 911 but did not speak to anyone. K.R. also called the victim's mother.

The victim denied that she had made up her story because the defendant had caught her and K.R. watching pornography the night before. She said that the pornographic video had popped up on the laptop while she and K.R. were using it and that the defendant had seen it and accused her and K.R. of being "some freaks." Later, after K.R. went to take a shower, the defendant asked the victim if the video was "turning [her] on." The victim stated that she

was telling the truth about what had happened. On cross-examination, she acknowledged that the pornographic video had not just popped up on the computer, but that her cousin, K.R., had shown it to her. She further acknowledged that the first time she mentioned the defendant's having put his fingers inside her vagina was during her interview at the Child Advocacy Center.

K.R., who was twelve years old at the time of trial, testified that she called 911 because the victim, who was acting scared and sad, came into her room on the night in question telling her that the defendant "ate her out." The witness said she hung up the phone before talking to the 911 dispatcher because she decided she wanted to tell her mother first. She said the victim did not say anything about the defendant using his fingers on her, but that she never asked her exactly what happened.

The victim's father testified that a couple of days after the May 5 episode he asked the defendant why he had put his hands on his daughter, and the defendant replied, "I don't know. There's no excuse." He said he told the defendant that he needed to turn himself in to the police.

Ashley Piper, the nurse practitioner who performed the sexual assault examination of the victim on May 6, 2010, testified that the victim's mother reported that at approximately 8:20 p.m. on May 5, 2010, the defendant pulled the victim's pants down and kissed the victim's privates. Piper stated that her physical examination findings neither confirmed nor discounted the account of sexual assault. She explained that vaginal tissue is made to "stretch and expand" and that it was not uncommon for there to be no injury associated with penetration. On cross-examination, she acknowledged that neither the victim nor her mother reported digital penetration.

Tennessee Bureau of Investigation Special Agent Forensic Scientist Donna Nelson, an expert in DNA serology, testified that she found neither semen nor alpha amylase, an enzyme present in saliva, on the victim's vaginal swabs. She agreed that the victim's having urinated and wiped herself could have removed any saliva present.

Sergeant Bernice Black of the Memphis Police Department's Juvenile Abuse Squad identified the defendant's May 25, 2010 statement to police, which was admitted as an exhibit and published to the jury. In the statement, the defendant claimed that the victim, at his request, accompanied him to the bedroom and pulled down her pants and underwear for him. He acknowledged that he "kissed on her vagina" and "engaged in oral sex with her," "for probably about two or three minutes," but said he never penetrated her vagina. The defendant explained that he was "under some heavy influence" of marijuana and alcohol at the time. He said that the episode was not "forceful" and that the victim essentially

-4-

"consented." He acknowledged, however, that he knew she was only eleven years old and therefore not old enough to consent. The defendant mentioned nothing in his statement about having caught the victim and her cousin watching a pornographic video on the night previous to the incident.

The defendant presented one witness in his defense: his cousin, Corrina Gonzalez, who testified that the defendant stayed at her home, off and on, from May 2, 2010, until May 27, 2010.

## ANALYSIS

### I. Election of Offenses and Timing of Instruction to Jury

The defendant's first three issues revolve around the fact that the trial court did not require the State to make an election of offenses at the close of its case-in-chief or before the case was submitted to the jury, but then recalled the jury an hour into its deliberations and issued a supplemental instruction on the State's election of oral sex. The State disagrees that an election was required, arguing that the digital penetration and oral sex were part of one continuing offense. In the alternative, the State argues that any error was harmless because the State effectively elected the offense of cunnilingus during its closing argument. The State additionally argues that it was within the trial court's discretion to recall the jury to issue the supplemental instruction.

The transcript reveals that both the State and the defendant requested that the State be allowed to make an election of offenses before the case was submitted to the jury, with the prosecutor announcing that she wanted to elect the offense of oral sex. The trial court, however, disagreed, finding that it was unnecessary under the facts of the case, in which the indictment charged the defendant with having penetrated the victim without specifying the type of penetration, and the evidence showed only a single episode lasting a mere five minutes. The trial court pointed out that the State was free to argue in closing that it was relying on the oral sex for the conviction. The prosecutor did so, telling the jurors that she wanted them "to concentrate on . . . the oral sex."

After the jury had deliberated for approximately one hour, the trial court decided, "out of an abundance of caution," to issue a supplemental instruction on the State's election of the offense of oral sex. Thereafter, over the defendant's objection, the court instructed the jury on the State's election of the act of cunnilingus for the jury to consider in its determination of whether the defendant was guilty of the offense of rape of a child.

The doctrine of election of offenses requires that when there is evidence at trial that a defendant has committed multiple offenses against a victim, the State must elect the facts upon which it is relying to establish each charged offense. State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001) (citations omitted). Thus, when the State presents evidence showing that more than one offense occurred, but the indictment is not specific as to which offense the defendant is being tried for, it is the responsibility of the trial court to require the State to elect which offense is being submitted to the jury. State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999); see also State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991) ("[I]n cases involving evidence which shows a real potential that a conviction may occur as a result of different jurors concluding that the defendant committed different acts, each of which separately showing the commission of an offense, the trial court must augment the general unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts.").

Our supreme court has observed that "'separate acts of intercourse may be so related as to constitute one criminal offense'" and that "the pertinent analysis requires consideration of numerous factors." State v. Kendrick, 38 S.W.3d 566, 569 (Tenn. 2001) (quoting State v. Phillips, 924 S.W.2d 662, 664-65 (Tenn. 1996)). "The factors include: the nature of the acts; the area of the victim's body invaded by the sexually assaultive behavior; the time elapsed between the discrete conduct; the accused's intent; and the cumulative punishment imposed." Id.

In this case, the digital penetration and cunnilingus occurred on the same area of the victim's body, in the same location in the house, and within the same short period of time. Indeed, from the victim's description of the events, it appears that the two types of penetration occurred very close in time, if not practically simultaneously, and that the defendant's touching of her vagina with his hands may have occurred in order to facilitate the cunnilingus. See, e.g., State v. Barney, 986 S.W.2d 545, 548 (Tenn. 1999) (concluding that when determining whether two or more sexual acts may be the subject of separate convictions, the relevant inquiry is "whether conduct is directly facilitative, and thus incidental, or merely preparatory in the sense of intending to arouse the victim or perpetrator"). As such, we conclude that the trial court did not err by initially finding that an election of offenses was unnecessary.

Morever, any error that may have occurred was cured by the prosecutor's electing the oral sex in closing argument and the trial court's recalling the jury and issuing the supplemental instruction. This court has repeatedly held that a trial court's error in not instructing the jury about the State's election of offenses may be harmless "where the prosecutor provides during closing argument an effective substitute for the missing instruction." State v. Adrian Keith Washington, No. M2008-01870-CCA-R3-CD, 2010 WL

653008, at *6 (Tenn. Crim. App. Feb. 24, 2010), perm. app. denied (Tenn. Aug. 26, 2010) (internal quotations and citations omitted). We disagree with the defendant's contention that he was prejudiced by the trial court's having recalled the jury to issue the supplemental instruction. The trial court appropriately instructed the jury that it was issuing an omitted instruction and that the jury was not to place any emphasis on the fact that the instruction was issued at a later time. "As a general rule, it is within the province of the court to recall a jury for supplemental instructions, but it is considered the better practice to admonish the jury not to place undue emphasis on the supplemental instructions and to consider them in conjunction with the entire charge." Leach v. State, 552 S.W.2d 407, 408 (Tenn. Crim. App. 1977).

## II. Sufficiency of the Evidence

The defendant also contends that the evidence is insufficient to sustain his conviction. Specifically, he argues that the testimony of the victim alone, particularly in the absence of physical findings to confirm the victim's account, was insufficient for the jury to find him guilty of the offense of rape of a child. The State disagrees, arguing that the victim's testimony, alone, was sufficient for the jury to find the defendant guilty beyond a reasonable doubt. We agree with the State.

When considering the sufficiency of the conviction evidence, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

"A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

"Rape of a child is the unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of an object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Id. § 39-13-501(7). "Cunnilingus" has been defined by this court as "a sexual activity involving oral contact with the female genitals," which does not require penetration of the vagina. State v. Alec Joseph Mesot, No. M2006-02599-CCA-R3-CD, 2008 WL 732151, at *6 (Tenn. Crim. App. Mar. 14, 2008).

Viewed in the light most favorable to the State, the evidence showed that the defendant took the eleven-year-old victim into a bedroom of the house, pulled her pants and underwear down, and performed cunnilingus on her. The victim immediately reported the abuse, and the defendant himself acknowledged on multiple occasions and to several different people that he had engaged in oral sex with the eleven-year-old victim. We conclude, therefore, that the evidence is more than sufficient to sustain the defendant's conviction for rape of a child.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE